FILED ____ ENTERED
____ LODGED ____ RECEIVED

MAR 21 2014

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION ) | |
| OF THE UNITED STATES OF AMERICA ) | CASE NO. **14-0549 TJS** |
| FOR A SEARCH WARRANT FOR THE ) | |
| SUBJECT LOCATION ) | UNDER SEAL |
| ) | |

## AFFIDAVIT IN SUPPORT OF A SEARCH AND SEIZURE WARRANT

### I. AFFIANT AND EXPERTISE

I, Gregg S. Horner, your Affiant, being duly sworn, depose and state as follows:

1. I am currently employed as a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so since November 1995. I am currently assigned to the Frederick, Maryland Resident Agency of the Baltimore Division. In connection with my official FBI duties, I investigate criminal violations of the federal controlled substance and money laundering laws, including, but not limited to, Title 21, United States Code, Sections 841, 843, 846, 952, 960 and 963; and Title 18, United States Code, Sections 2, 1956 and 1957. I have received special training in the enforcement of laws concerning money laundering and controlled substances as found in Title 21 and Title 18 of the United States Code. I have been involved in various types of electronic surveillance, and in the debriefing of defendants, witnesses and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and of the laundering and concealing of proceeds from controlled substance trafficking.

2. , I am familiar with the ways in which controlled substance traffickers conduct their business, including, but not limited to, their methods of importing and distributing

1

narcotics, their use of computers, telephones and their use of numerical codes and code words to conduct their transactions.

3. I am familiar with and have participated in all of the normal methods of investigation, including, but not limited to, foot, auto, air, and electronic surveillance, the interviewing of witnesses, the use of informants, the use of pen registers, Title III wiretaps, and undercover operations. In that same capacity, I have become familiar with the documents and records commonly maintained by persons who manufacture and distribute controlled substances. I have on numerous occasions participated in the execution of search warrants where documents, records and controlled substances have been located and seized. I have also had experience in debriefing defendants, participant witnesses, informants, and other persons who have personal knowledge of the amassing; spending; converting; transporting; distributing; laundering; and concealing of proceeds of narcotics trafficking. In addition, I have experience in investigating computer-assisted crimes committed by individuals who traffic in illegal controlled substances.

4. Your affiant knows based on his knowledge, training, and experience that persons involved in the illegal distribution of narcotics, or money laundering/structuring in relation to narcotics, often keep and maintain records of their various illegal activities. Experience in similar cases has demonstrated that such records are regularly concealed in a suspect's residence or "stash house," and that they take various forms. Documents commonly concealed by traffickers, or those involved in money laundering/structuring in relation to narcotics, include but are not limited to notes in code, deposit slips, wired money transactions, savings pass books, hidden bank accounts, photographs of co-conspirators, various forms of commercial paper, personal address books, notebooks, records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, and/or train tickets) both commercial and private, money orders and

other papers relating to the ordering, transportation, sale and distribution of controlled dangerous substances or other such documents which will contain identifying data on the co-conspirators. The aforementioned items are kept in locations that are considered safe by the drug traffickers or money launderers, such as residences and stash houses, and on their person, where they have ready access to them.

5. In addition, based on my knowledge, training and experience, narcotics traffickers frequently use cellular telephones, communication devices, and other electronic media storage to further their illegal activities and frequently maintain numerous such electronic devices in an effort to conceal their activities.

6. Based on my training, knowledge, and experience, your Affiant also knows that electronic equipment, such as computers, cellular telephones, PDA's, currency counting machines, telephone answering machines, and related manuals are used by narcotics traffickers to generate, transfer, count, record and/or store the information described above. Additionally, computer software, tapes and discs, and the contents therein, often contain the information generated by the aforementioned electronic equipment.

7. Based on my training, knowledge, and experience, your Affiant knows that drug traffickers commonly maintain addresses and/or telephone numbers in cellular telephones, books, papers, or computers which reflect names, addresses, and/or telephone numbers of their associates in their trafficking organization.

8. Based on my training, knowledge, and experience, your Affiant knows that drug dealers/manufacturers frequently photograph and/or videotape themselves and/or their associates in possession of controlled dangerous substances and/or the proceeds of their drug deals. Your Affiant has observed numerous instances of this practice.

## II.  LOCATION TO BE SEARCHED

9. This Affidavit is filed in support of an Application for a Search and Seizure Warrant for the SUBJECT LOCATION, which is presently located in the District of Maryland. This location relates to an investigation being conducted jointly by the West Virginia State Police ("WVSP") and the Federal Bureau of Investigation ("FBI").

10. Because this Affidavit is being submitted for the limited purpose of establishing probable cause for a search warrant, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. I have not, however, excluded any information known to me that would defeat a determination of probable cause. The information contained in this Affidavit is based upon my conversations with other law enforcement officers and other individuals with personal knowledge and who have reviewed documents and other evidence. All conversations and statements described in this Affidavit are related in substance and in part unless otherwise indicated.

11. This affidavit is submitted in support of an application to search the following location (the "SUBJECT LOCATION"):

> **22703 Minnetonka Road, SW, Apartment 203, Westernport, MD 21562,** a second-floor apartment located in a two-story apartment building with a red brick and white trim exterior. This building is commonly known as the Marsh Apartments. The apartment to be search is further described by photograph in Appendix C. Apartment 203 is on the second floor on the right as you reach the top of the steps and the number 203 is on the door.

4

### III. PROBABLE CAUSE

12. In March of 2014, I received information from the WVSP regarding a cocaine trafficker, Patrice Stephens ("Stephens"), who operates between New York, New York, Keyser, West Virginia, and Westernport, Maryland.

13. From December 6, 2011, until May 2013, the WVSP utilized a reliable confidential source ("CS") to make eighteen (18) controlled purchases of cocaine from Cedric Malachi Jones ("Jones") in Keyser, Mineral County, West Virginia.

14. In March and April of 2012, Paul Ellis ("Ellis") rented a vehicle on two occasions from Enterprise Car Rental of Keyser, West Virginia. Jones utilized those vehicles during a number of the controlled transactions referenced in the previous paragraph.

15. In May 2013, with the assistance of a pen register/trap and trace device connected to a cellular telephone belonging to Jones, the WVSP and FBI were able to track the movements of Jones, including multiple trips from Palm Coast, Florida, to South Ozone Park, New York, before arriving in the area of Keyser, West Virginia, and Westernport, Maryland.

16. On June 23, 2013, the WVSP utilized the CS to make an additional controlled purchase of cocaine from Jones in Keyser, Mineral County, West Virginia.

17. On September 10, 2013, the WVSP made a traffic stop on Jones near Keyser, West Virginia. The pen register/trap and trace device showed that Jones had traveled from South Ozone Park, New York. A subsequent search of the vehicle pursuant to a search warrant revealed approximately two (2) ounces of cocaine hidden within the vehicle's spare tire. Prior to that search, Jones was released and has since fled to South Ozone Park, New York. Jones has not returned to Keyser, West Virginia since fleeing on September 10, 2013.

18. The WVSP and FBI have reason to believe that Stephens is making drug distributions on behalf of, and in the absence of, Jones and has been making trips to New York, New York, to be supplied with controlled substances to distribute in Keyser, West Virginia, utilizing the SUBJECT LOCATION as a "hold house," which your affiant understands is a type of stash house for narcotics.

19. On February 27, 2014, the WVSP interviewed Ellis who agreed to cooperate with the investigation. Ellis advised that since September 10, 2013, he and Stephens have made four (4) trips to New York, New York, to resupply with cocaine to be distributed in Piedmont and Keyser, West Virginia. On two of those trips, Ellis and Stephens met and were supplied cocaine by Jones. On the other two trips, Ellis and Stephens met and were supplied cocaine by an unknown male. Ellis advised that Stephens calls Jones or the unknown male with Stephens' cellular phone. Ellis stated that he and Stephens use Ellis' personal vehicle for these trips. Ellis advised that when he and Stephens meet the unknown male, they are able to make the round trip in the same day. Ellis further advised that upon returning from New York, Stephens holds the cocaine at the SUBJECT LOCATION for distribution into Piedmont and Keyser, West Virginia.

20. At the direction of the WVSP, On March 3, 2014, another confidential source ("CS2") made a telephone call to an individual named Troy Wilt ("Wilt") to arrange a transaction of approximately two (2) grams of cocaine. This telephone call was not recorded by law enforcement. Wilt advised CS2 to pick him up and travel to the SUBJECT LOCATION to obtain the cocaine from Stephens. At approximately 4:09 p.m., CS2 picked Wilt up from Wilt's residence on Maryland Street, in Keyser, West Virginia. Wilt directed CS2 to travel to the SUBJECT LOCATION. CS2 traveled to the SUBJECT LOCATION and parked at approximately 4:25 p.m. Wilt exited the vehicle and entered the SUBJECT LOCATION. At

approximately 4:30 p.m., Wilt exited the SUBJECT LOCATION and reentered the vehicle of CS2. While en route back to Wilt's residence, but still in the State of Maryland, Wilt handed CS2 what has subsequently been field-tested to be approximately two (2) grams of cocaine in exchange for $200.00 in recorded United States Currency which CS2 had previously provided to Wilt. At approximately 4:50 p.m., CS2 dropped Wilt off at Wilt's residence. At approximately 4:53 p.m., CS2 met with the WVSP in Keyser, West Virginia, and turned over the purchased evidence.

21. On March 04, 2014, Ellis informed the WVSP that he and Stephens plan to make their next trip to New York, New York, to meet and be supplied with cocaine by the unknown male in the next few days. Based upon the consent of Ellis, the WVSP plans to place a GPS tracking device on Ellis' vehicle, which he and Stephens plan to utilize for the trip. The WVSP has also obtained a pen register/trap and trace device on the cellular telephone that belongs to Stephens.[1] Ellis advised that he and Stephens plan to return with the cocaine to the SUBJECT LOCATION on the same day of departure.

## IV.   CONCLUSION

22. Based on the information set forth in this affidavit, I believe that sufficient probable cause exists to believe that in the SUBJECT LOCATION, there is evidence of the possession with intent to distribute controlled substances, to wit cocaine, in violation of 21 U.S.C. § 841.

A. Cellphones

23. In addition, due to Stephens' use of a cellular telephone to arrange his meetings with Jones and the unknown male in New York to resupply with cocaine, as well as my training

---

[1] WVSP identified this as Stephens' phone based on information provided by Ellis and independent investigation including a previously issued Grand Jury subpoena for subscriber information.

and experience, which indicates that drug traffickers utilize cellular telephones, communication devices, and other electronic media storage devices as described in ¶¶ 2(b), (d), and (e), I seek permission to search any cellular telephone seized while searching the SUBJECT LOCATION for recent calls, contacts, address books, text messages, voicemail messages, email, photographs and other forms of communication. I know in my experience that this information is often only temporarily stored in cellular telephones, and that there exist technologies whereby a remote user can delete information sought by law enforcement from a cellular telephone. These communication devices will be searched according to the protocol on Attachment B.

B. Nighttime Execution

24. Because these warrants are being executed for offense related to Title 21 of the United States Code, involving narcotics trafficking, and because the nature of this investigation is on-going, and that none of the targets of this investigation have been arrested, I request permission, pursuant to 21 U.S.C. § 879, to execute the warrants at any time to protect the integrity of the investigation, prevent the destruction of evidence and to ensure the safety of the agents executing the warrants.

25. In addition, investigators are planning to execute the warrant at the SUBJECT LOCATION after Stephens returns from his next trip to New York. If he returns at night, investigators will execute the warrant at that time.

# 14-0549TJS

26. WHEREFORE, in consideration of the facts presented, I respectfully request that this Court issue a search warrant for the SUBJECT LOCATION for the items listed on Attachment A, which constitute fruits, evidence and instrumentalities of violations of 21 U.S.C. § 846, which prohibits the conspiracy to distribute and possess with intent to distribute controlled substances.

_____
Gregg S. Horner, Special Agent
Federal Bureau of Investigation

Sworn to before me this 5th day of March 2014 at 4:50 pm Hours.

_____
Timothy J. Sullivan
United States Magistrate Judge

9

## ATTACHMENT A

### Items to be Seized

The Subject Locations shall be searched for:

1. Controlled substances, as well as paraphernalia used in the manufacture, preparation, packaging, or weighing of illegal narcotics in preparation for distribution;

2. Books, records, computers, personal digital assistants, cell phones, flash media, which may reflect names, addresses and/or telephone numbers of their associates with drug trafficking organizations;

3. Photographs;

4. Records of financial transactions, including bank deposit slips, bank accounts, check ledgers and bank cards;

5. All books, records, bank statements, canceled checks, deposit tickets, financial statements, correspondence and other pertinent documents furnished by or on behalf of the listed individuals indicating the individuals might have a financial interest;

6. Documents related to use of professional or private money transmitters that reflect the transfer of money on behalf or to a known member of the organization or a listed individual;

7. Documents that refer or relate in any way to financial institutions, investment or bank accounts, and credit/debit card accounts;

8. Documents that refer or relate in any way to assets such as but not limited to vehicles, real estate, precious metals, etc purchased by or on behalf of the listed individuals;

9. Records of shipments of controlled substances; and

10. Currency or currency equivalents.

11. Paraphernalia for packaging and distribution of controlled substances, including scales, plastic bags, vials, cutting agent (such as Mannitol and Quinine), and kilogram wrappers.

# ATTACHMENT B

This warrant authorizes the search of electronically stored information as described in Attachment A.

Because of the possibility that the electronically stored information in the subject electronic devices on Attachment A may include information that is beyond the scope of the information for which there is probable cause to search, the search shall be conducted in a manner designed to minimize to the greatest extent possible the likelihood that files or other information for which there is not probable cause to search is not viewed. While this protocol does not prescribe the specific search protocol to be used by the Federal Bureau of Investigation ("FBI"), it does contain limitations to what they may view during their search, and the agents shall be obligated to document the search methodology used in the event that there is a subsequent challenge to the search that was conducted pursuant to the following protocol:

With respect to the search of any digitally/electronically stored information that is seized pursuant to this warrant, and described in Attachment A hereto, the search procedure shall include such reasonably available techniques designed to minimize the chance that investigators conducting the search will view information that is beyond the scope for which probable cause exists. The following list of techniques is a non-exclusive list which illustrates the types of search methodology that may avoid an overbroad search, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein:

1. Use of computer search methodology to conduct an examination of the electronically stored information contained in the subject electronic devices to determine whether that data falls within the items to be seized as set forth herein by specific date ranges, names of individuals, or organizations;

2. Searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein;

3. Physical examination of the storage device, including digitally surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth herein.

**14-0549TJS**

**ATTACHMENT C**





14-0549TJS



